UNPUBLISHED OPINION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| Jacqueline AKRIGG, | |
| Plaintiff, | Civil No. 17-0237 (RBK) |
| v. | **OPINION** |
| COMMISSIONER OF SOCIAL SECURITY | |
| Defendants. | |

**KUGLER**, United States District Judge:

This matter comes before the Court upon the appeal of Plaintiff Jacqueline Akrigg for review of the final decision of the Commissioner of Social Security. (Doc. No. 1.) The Commissioner denied Plaintiff's application for Social Security Disability Insurance ("SSDI") benefits, finding Plaintiff was not disabled as defined by the Social Security Act. As explained below, the decision of the Commissioner is **AFFIRMED**.

### I.    BACKGROUND

#### A. Plaintiff's Vocational Background, Work Experience, and Daily Activities

Plaintiff was 34 years old on the onset date of her alleged disability, and 37 on the date of the ALJ's decision, making her a "younger individual" as defined by the Social Security Regulations. (R. 24, 189.) *See* 20 C.F.R. §§ 404.1563(d), 416.963(d). Plaintiff completed high school and some college, and previously worked as a collections clerk at a collections agency. (R. 39, 213, 391, 575.)

Plaintiff last worked on December 23, 2010, about a year and a half before her alleged disability onset date on July 20, 2012. (R. 189, 231.) She stopped working not because of her

1

condition, but because she was laid off. (R. 391.) Plaintiff then collected unemployment benefits for a time (R. 575.) Plaintiff testified that after this, she obtained another job in collections, but did not start it as she had fallen and sprained her ankle in 2012. (R. 320, 575.)

On August 13, 2012, Plaintiff completed a Function Report – Adult. (R. 222-29.) On that form, Plaintiff states that she lived in an apartment with her children, aged 11 and 14. She had no problems with personal care, could prepare simple meals, and performed indoor chores such as laundry and dusting while sitting down. (R. 224.) Plaintiff further stated that she could drive a car, go grocery shopping, pay bills, handle a savings account, and use a checkbook. (R. 225.) She stated she spent time with others, visited with her family, had lunch, made crafts, played games, read, did crossword puzzles, and decorated her house. (*Id.*) She indicated she could follow written and spoken instructions well, could pay attention for an "average" length of time, and finish what she started. (R. 227.)

The following year, on July 5, 2013, Plaintiff's friend completed a second report on Plaintiff's behalf. (R. 247-54.) She stated that she and her children had moved to Washington, D.C., to live with her sister, but had since moved back to New Jersey to live with her grandparents. (R. 568-69.) She indicated that Plaintiff engaged in few activities and that her children and grandparents took care of most of her needs. (R. 545, 559, 563.)

### B. Medical Evidence

*1. 2012*

On July 21, 2012, Plaintiff presented to the emergency room. (R. 318.) She stated she had slipped and had fallen down three to four steps, and that she had severe pain in her left foot and ankle. (R. 318.) Mark Mathason, D.O., examined her and assessed that the left ankle exhibited swelling and a limited range of motion due to pain, but that Plaintiff had intact distal motor and

2

sensory functions. (R. 319.) Plaintiff's left foot had no swelling and a full range of motion, but a mild tender fifth metatarsal. (R. 319.) The remainder of the physical exam did not indicate any irregularities, including that her back was normal on inspection. (R. 319.) She also denied psychiatric symptoms. (R. 319.) X-rays of Plaintiff's left foot were "normal" other than a plantar calcaneal spur, and x-rays of her left ankle were normal. (R. 323-25.) Plaintiff was assessed with an ankle sprain and provided a splint and crutches. (R. 320.)

Three days later, on July 24, 2012, Plaintiff presented to Cynthia Nossen, PA-C, and Manny Porat, M.D., at Reconstructive Orthopedics. (R. 335-36.) Plaintiff informed PA-C Nossen not that she fell over steps, but that she had recently moved into a new house, and that she tripped and fell on new carpeting in a spot that was sticking up. (R. 335.) She complained of pain and difficulty sleeping. (R. 335.) On examination, her left ankle revealed swelling with some bruising around the lateral aspect of the ankle as well as on the foot and heel. (R. 335.) She was tender all along her left ankle as well as on the foot and heel. (R. 335.) She was able to plantar flex and dorsiflex without pain and was again assessed with an ankle sprain. (R. 336.) Plaintiff was put in a walking boot, told she was going to have to wean herself off crutches over the next couple of weeks, and was to follow up again with another doctor in a few weeks' time. (R. 335-336.)

Plaintiff then presented to Pradip Patel, M.D., on August 12, 2012. (R. 329-31.) She could walk at a reasonable pace without a handheld device, squat, walk on her heels and toes, and had no sensory or reflex loss. (R. 330.) She had 4/5 muscle strength bilaterally. (R. 330.) Dr. Patel opined that she could stand or walk up to two hours a day, and sit less than six hours a day. (R. 327.)

On August 30, 2012, Plaintiff reported to Merrick J. Wetzler, M.D., at Jersey Orthopedic Associates for evaluation of her left ankle and leg as well as her back. (R. 338.) She stated that her

previous care provider, Reconstructive Orthopedics, did not take her insurance. (R. 339.) Plaintiff informed Dr. Wetzler that she had a history of asthma. (R. 339.) On exam, Plaintiff had a painful left ankle with decreased dorsi and plantar flexion, pain in her left leg, and normal sensation and pulses distally. (R. 339.)

An MRI of Plaintiff's lumbar spine performed on September 6, 2012 revealed small disc protrusion at T12-L1 with no central canal or foraminal stenosis, and large right disc protrusion at L5-S1 with disc effacing the right ventral thecal sac and posteriorly displacing the traversing right S1 nerve root in the lateral recess with mild to moderate central canal stenosis. (R. 315.)

On September 18, 2012, Plaintiff returned to Dr. Wetzler. (R. 338.) She was still symptomatic in her ankle in that she complained of pain and discomfort. (R. 338.) An MRI of her back showed some pathology on the right, but she was described as not symptomatic. (R. 338.) Her ankle was described as symptomatic of pain. (R. 338.) She was still using the walking boot. (R. 338.)

Another MRI was conducted on September 24, 2012 (R. 311.) The MRI suggested a fracture of the posterior malleolus of the tibia with slight separation of the fracture fragment; bone marrow edema in the same region suggestive of an osteochondral injury, and minor edema within the distal fibula. (R. 311.) The posterior tibial tendon appeared to be intact overall, and Plaintiff had thickening of the Achilles tendon suggestive of tendinosis. (R. 311.) The attending physician noted the plantar calcaneal spur. (R. 311.) There was some small amount of fluid in the ankle joint and, possibly, a small foreign body within the soft tissues of the region. (R. 311.)

On November 18, 2012, Plaintiff commenced physical therapy. (R. 342.) She reported on December 20, 2012 that she had increased swelling and decreased range of motion in her left ankle, but admitted that she had been walking for "several hours" that day. (R. 353.) Ultimately, her

4

physical therapist noted Plaintiff had "very poor attendance" and was educated on the importance of continuing physical therapy. (R. 353.) On a visit on January 3, 2013, Plaintiff reported pain but stated she was "doing okay." (R. 348.)

### 2. *January to June 2013*

On January 19, 2013, Plaintiff presented to Juan C. Cornejo, D.O., for a consultative physical examination. (R. 361-64.) She complained of neck, lower back, and left ankle pain. (R. 361.) She stated that she had constant discomfort in the legs throughout the day and had a difficult time sleeping, standing, and sitting beyond 20 minutes at a time. (R. 361.) Plaintiff stated she used a cane, a wheelchair, and crutches sometimes, but she did not bring any of them to the examination. (R. 361.) Plaintiff informed Dr. Cornejo that she was able to dress and shower herself as well as drive a vehicle. (R. 362.)

On examination, Plaintiff had decreased range of motion in her cervical spine with palpable spasm and tenderness but a Spurling's maneuver—used to assess nerve root pain—was negative. (R. 363.) She had full range of motion, 5/5 grip strength, 2+ reflexes, intact sensation to pinprick and soft touch in her upper extremities, and was able to separate papers and fasten buttons. (R. 363.) Dr. Cornejo stated that Plaintiff ambulated with a limp on the right, had decreased strength in her lower extremities, and positive straight leg raising on the right at 90 degrees. (R. 363.) She did not require an assistive device for ambulation, had full range of motion in her lower extremities, and had 2+ reflexes. (R. 363.) She was not able to squat. (R. 363.) Her grip and pinch strength were full. (R. 366.)

On a separate form. Dr. Cornejo wrote that Plaintiff reported that she used a wheelchair and cane outside for walking, but that she did not use those devices properly. (R. 365.) He also

5

noted that she did not bring these devices to her examination and that she could walk at a reasonable pace. (R. 365.) Dr. Cornejo concluded:

> [Plaintiff] would be limited from frequent turning and bending of her neck and lower back and from prolonged walking and standing. She does have full overhead use of her upper extremities. She does have full functionality of the left and right hands. She would be able to handle and sort through fine and small objects. She would be able to sit for a reasonable amount of time.

(R. 364.)

On February 1, 2013, Plaintiff presented to Todd Rinnier, D.O., at ASAP Advanced Spine and Pain, LLC. (R. 379.) She stated that she was involved in a "slip and fall" injury on July 2012, where she "impacted" her head, neck, lower back, right hip, and left lower extremity. (R. 379.) She reported continued pain in her neck, midback, lower back, and left ankle (R. 379-80), but her pain improved with medication, physical therapy, and rest. (R. 379-80.) Dr. Rinnier noted on exam that Plaintiff's cervical and lumbar spine had a reduction in range of motion by only 5% and that she had mild tightness, stiffness, and spasm in the thoracic spine on palpation. (R. 381-82.) Plaintiff's straight leg raise was negative on the left, but positive on the right, and she had 5/5 strength and intact sensation in her upper and lower extremities, but 2/4 deep tendon reflexes. (R. 381-82.) Plaintiff denied psychiatric symptoms. (R. 380.)

Plaintiff underwent an MRI on March 1, 2013, which revealed cervical straightening, a bulging disc, possible moderate midline protusion at C5-C6, and no gross evidence of central stenosis. (R. 436.) A few days later, on March 5, 2013, Plaintiff returned to Dr. Rinnier for pain management. (R. 375.) Dr. Rinnier noted that Plaintiff was "receiving adequate analgesic benefit from the medications prescribed with the improvement in their ability to perform activities of daily living" and that Plaintiff "reports no adverse side effects from the medication." (R. 378.) Plaintiff was referred to a neurologist. (R. 378.)

On March 13, 2013, Plaintiff presented to Chiara Mariani, M.D., a neurologist at Pain Associates, P.C. (R. 444.) She told Dr. Mariani that in July 2012 she had tripped over a Comcast wire, causing her to trip and fall down the stairs. (R. 447.) She claimed that she flipped a couple times at the end of the steps and hit her head on a heavy metal door. (R. 447.) Plaintiff complained of continued musculoskeletal pain and headaches. (R. 447.) On exam, she had decreased range of motion and tenderness in the cervical spine as well as a positive Spurling's test on the left side, but 5/5 strength in the upper extremities and a Hoffman's test—a reflex test—was negative. (R. 448.) A nerve conduction study and EMG of the upper extremities showed a right ulnar nerve entrapment at the elbow. (R. 441, 444.) On April 2, 2013, Plaintiff told Dr. Mariani that her neck pain was only mild but that she had lower back pain, difficulty sleeping, and hand numbness. (R. 441.) An EMG/NCV in the upper extremities showed a right ulnar nerve entrapment at the elbow. (R. 441.)

Plaintiff underwent cervical and lumbar epidural injections in April and May 2013, and on June 3, 2013, Plaintiff told Dr. Rinnier that her recent lumbar epidural had provided 60-70% pain relief and her cervical epidural provided 40-50% pain relief. (R. 368, 384-85.)

3. *July to December 2013*

On July 25, 2013, Plaintiff presented to Lewis A. Lazarus, Ph.D., for a consultative mental health examination. (R. 391-93.) Her friend drove her to the consultative examination. (R. 391.)

Plaintiff told Dr. Lazarus that she had last worked in October 2010 as an arbitrator in collections, but regulations changed, the company downsized, and she was laid off. (R. 391.) She stated she fell down some steps the previous July that caused seven herniated discs as well as other injuries to her vertebrae and an ankle injury. (R. 391.) Plaintiff stated she had not had any outpatient mental health treatment before. (R. 392.) Plaintiff told Dr. Lazarus that her physical limitations greatly limited her activities of daily living such that she needed help with personal

7

care and could not cook or do chores. (R. 392-93.) She stated she enjoyed reading and socializing with a few friends and family members. (R. 393.)

Dr. Lazarus observed that Plaintiff was cooperative, her manner of relating and social skills were strong, and she made good eye contact. (R. 392.) She was appropriately dressed and groomed. (R. 392.) Plaintiff appeared with a cane, and her gait was marked by a left-sided limp and her posture was slouched. (R. 392.) Plaintiff's speech was fluent, with adequate expressive and receptive language functions, and her thought processes were coherent and goal-directed, with no evidence of hallucinations, delusions, or paranoia. (R. 392.) Her affect was depressed and tearful, but Dr. Lazarus noted she was trying to stay positive. (R. 392.)

On exam, Plaintiff was alert, oriented to all spheres, could name the current President of the United States, and "her recent and remote memory skills were noted to be moderately impaired with respect to recent memory and new learning." (R. 392.) Dr. Lazarus explained that Plaintiff's recall was imperfect and stalling, as were her attention and concentration. (R. 392.) Plaintiff was able to perform counting and simple calculations, and could correctly repeat five digits in the same order of presentation, among other mental tasks. (R. 392.) Dr. Lazarus stated that Plaintiff was functioning within the average range with an average fund of general knowledge and that her insight and judgment were both good. (R. 392.) He also noted Plaintiff's recent weight gain of about 60 pounds. (R. 392.) Dr. Lazarus assigned Plaintiff a Global Assessment of Functioning (GAF) score of 50 and stated that a vocational assessment and rehabilitation could be problematic because of her underlying physical issues. (R. 393.)

Plaintiff returned to Dr. Rinnier about once every month or two for pain management between August 2013 and December 2013. (R. 486-97.) Her physical exams remained similar to

8

those she had had in February 2013. She continued to state she benefited from the analgesic effects of her medications and reported 10 out of 10 pain on a 0-10 scale for her back pain. (R. 489.)

Plaintiff also presented to Twin Oaks Community Services Early Intervention Support Services (EISS), a short-term crisis diversion program, in September 2013, where she was seen by a case manager. (R. 454.) She went there eight separate times in September and October 2013, and was ultimately discharged with prescriptions for Wellbutrin and Klonopin. (R. 454, 428.)

   *4. 2014-2015*

Plaintiff moved to Maryland in December 2013 and back to New Jersey in June 2014. (R. 144.) Notwithstanding the move, she continued to visit Dr. Rinnier for pain management several times. (R. 477-85.) After returning, she continued to report to Dr. Rinnier through March 2015. (R. 461-76, 512-28.) Beginning in July 2014, Dr. Rinnier started to note that Plaintiff's cervical and lumbar spine had a reduction in range of motion by 10-15%. (R. 475.) By October 2014, that had reduced to a 5-10% reduction in range of motion. (R. 466-469.) Other symptoms were similar to prior reports, subject to other fluctuations. (R. 469.)

On November 17, 2014, Dr. Rinnier opined that Plaintiff could sit, stand, and walk one hour each during an 8-hour workday; frequently lift 6 to 10 pounds, occasionally life up to 21 pounds; could not bend, stoop, squat, crawl, or climb; could not engage in simple digital manipulations; could occasionally reach above shoulder level; could not use foot controls on the left but could on the right; and could not engage in activities involving unprotected heights, moving machinery, automotive equipment, exposure to weather changes or dust, fumes, and gases. (R. 458.) In short, Dr. Rinnier opined there was very little Plaintiff was capable of doing, basing his conclusion on Plaintiff's complaints of pain. (R. 459-60.)

### 5. *State Agency Physician and Psychologist Opinions*

State agency physician Jyothsna Shastry, M.D., initially reviewed Plaintiff's records on February 5, 2013, and opined that Plaintiff could stand or walk for about two hours in an eight-hour day; could sit six hours in an eight-hour day; could push or pull with the lower left extremity; could frequently lift or carry objects up to 10 pounds; could occasionally climb ramps and stairs, crouch, crawl, and stoop; but could not climb ladders, ropes, or scaffolds. (R. 59-61.) State agency physician, Jose Rabelo, M.D., affirmed Dr. Shastry's opinion in August 2013. (R. 85-86.)

State agency physician, Thomas Yared, M.D., reviewed Plaintiff's records on August 16, 2013, including those of the consultative examiner, Dr. Lazarus, and concluded that Plaintiff had mild limitations in activities of daily living, social functioning, concentration, persistence, and pace. (R. 84.)

### C. The June 8, 2015 Hearing

On June 15, 2015, the ALJ held a hearing. Plaintiff testified that her medication made her drowsy and that it affected her memory. (R. 569.) She described her back pain as a throbbing, burning, stabbing feeling radiating down both of her legs. (R. 549.) She experienced tingling and numbness in her legs, and testified that when she wakes up in the morning her hands, feet, legs, and arms tingle too. (R. 549-550.) She testified that these symptoms persist on and off throughout the day. (R. 550.) Plaintiff also noted that her neck pain comes and goes with the weather and degree of activity, and that the pain is less intense so long as she can stay inside and lay in her recliner. (R. 549.) She stated she could only sit in a normal chair upright, with medication, for no more than 20 minutes. (R. 558.) She could not open jars or fasten her bra; she could not hold a pen or type. Instead, her daughter helps her with buttoning and zippering, and she uses a voice-prompted device to write. (R. 559-561, 585.)

Due to her symptoms, Plaintiff also testified that she does not sleep well. (R. 564.) She stated she habitually napped during the day, and showers using a shower seat. (R. 581-82.) She stated she was often unable to go shopping or join with her children in many activities. (R. 565-66, 587.) She experienced severe pain from routine activities; for example, the brief activity of taking pictures at her daughter's dance recital for two hours caused pain sufficient to prevent her from getting out of her recliner the entire next day. (R. 565-66, 587.) She takes medication to assist with her pain, but not if she has an appointment, like the administrative hearing; this ensures she stays awake. (R. 552-53.) At the time of the ALJ's decision, Plaintiff was living in her grandparents' one-level home with her grandparents and two children. (R. 602.) She testified she lived with her grandparents so that she did not have to deal with steps. (R. 602.) Plaintiff's boyfriend had brought her to the hearing. (R. 545.)

At the hearing, Plaintiff relied on Dr. Patel's opinion that she would be limited to sedentary work (R. 326-28) and Dr. Rinnier's opinion that she could only sit, stand, or walk for one hour a day, respectively. (R. 458-60.) Also at the hearing, an impartial vocational expert, Marion Morocco, testified that an individual of Plaintiff's age, education, and vocational background who had Plaintiff's credibly established limitations would be able to perform several representative unskilled jobs. (R. 591-96.)

### D. The ALJ's Decision

After reviewing the record, the ALJ considered the Plaintiff's residual functional capacity ("RFC"). An RFC is the most a claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945. The ALJ described her formulation of Plaintiff's RFC as follows:

> [S]edentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) except that [Plaintiff] can walk or stand up to 2 hours per day, can sit for up to 6 hours per day, but nor more than an hour at a time, and then would need to shift positions for 4-5 minutes while remaining on task, can occasionally reach overhead, but never use

> foot controls, push, or pull with the left lower extremity, can occasionally bend, stoop, and crouch, but never crawl, can occasionally climb ramps or stairs, but never climb scaffolds, ladders, or ropes, and must avoid exposure to unprotected heights, moving machinery, humidity, extreme temperatures, dust, fumes, or gases. [Plaintiff] can frequently interact with supervisors, coworkers and the general public, make simple, work related decisions, and can satisfy production quotas, but not at a production rate pace.

(R. 33-39.) Finding that Plaintiff could perform work in the national economy, the ALJ found that Plaintiff was not disabled.

### E. Procedural History

Plaintiff originally filed an application for DIB and SSI on August 8, 2012, alleging an onset date of disability beginning July 20, 2012. She alleged major joint dysfunction, spine disorders, and affective disorders, among other impairments. (R. 55-63, 64-72, 75-89.) This application was denied initially and on subsequent reconsideration. (R. 92-97, 103-107, 108-112.) On September 24, 2013, Plaintiff sought review before an Administrative Law Judge. (R. 113-114, 115-117.) The ALJ denied Plaintiff's application on July 16, 2015. (R. 24-47.) Plaintiff then sought review by the Appeals Council, which was denied on November 28, 2016. (R. 1-6.) This action was filed in this Court on July 17, 2017.

## II. LEGAL STANDARD

When reviewing the Commissioner's final decision, this Court is limited to determining whether the decision was supported by substantial evidence, after reviewing the administrative record as a whole. *Zirnsak v. Colvin*, 777 F.3d 607, 610 (3d Cir. 2014) (citing 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000). Substantial evidence is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence." *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005) (quotation omitted). Courts may not set

aside the Commissioner's decision if it is supported by substantial evidence, even if this court "would have decided the factual inquiry differently." *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001).

When reviewing a matter of this type, this Court must be wary of treating the determination of substantial evidence as a "self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). This Court must set aside the Commissioner's decision if it did not take into account the entire record or failed to resolve an evidentiary conflict. *See Schonewolf v. Callahan*, 927 F. Supp. 277, 284–85 (D.N.J. 1997) (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)). Evidence is not substantial if "it really constitutes not evidence but mere conclusion," or if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114). A district court's review of a final determination is a "qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham." *Kent*, 710 F.2d at 114.

### III. DISCUSSION

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ used the established five-step evaluation process to determine whether Plaintiff was disabled. *See* 20 C.F.R. § 404.1520. For the first four steps of the evaluation process, the claimant has the burden of establishing his disability by a preponderance of the evidence. *Zirnsak v. Colvin*, 777 F.3d 607, 611–12 (3d Cir. 2014). First, the claimant must show that he was not engaged in "substantial gainful activity" for the relevant time period. 20 C.F.R. § 404.1572.

Second, the claimant must demonstrate that he has a "severe medically determinable physical and mental impairment" that lasted for a continuous period of at least twelve months. 20 C.F.R. § 404.1520(a)(4)(ii); 20 C.F.R. § 404.1509. Third, either the claimant shows that his condition was one of the Commissioner's listed impairments, and is therefore disabled and entitled to benefits, or the analysis proceeds to step four. 20 C.F.R. § 404.1420(a)(4)(iii). Fourth, if the condition is not equivalent to a listed impairment, the claimant must show that he cannot perform his past work, and the ALJ must assess the claimant's residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(a)(4)(iv); 20 C.F.R. § 404. 1520(e). If the claimant meets his burden, the burden shifts to the Commissioner for the last step. *Zirnsak*, 777 F.3d at 612. At the fifth and last step, the Commissioner must establish that other available work exists that the claimant is capable of performing based on his RFC, age, education, and work experience. *Id.*; 20 C.F.R. § 404.1520 (a)(4)(v). If the claimant can make "an adjustment to other work," he is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(v).

We agree the ALJ had substantial evidence to support her conclusion about Plaintiff's non-disability. She took the entirety of the record under consideration and explained the bases for her factual findings and the inconsistencies she found among the many medical opinions presented to her. We now address Plaintiff's arguments, but find that they are not persuasive.

### A. The ALJ's Weighing of the Evidence Was Supported by Substantial Evidence

Plaintiff first argues that the ALJ failed to properly weigh the medical evidence. An ALJ has a duty to consider all medical evidence placed before her and must provide an adequate reason for dismissing or discarding evidence. *Akers v. Callahan*, 997 F. Supp. 648 (W.D. Pa. 1998) (citing *Wier on Behalf of Wier v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984)). An ALJ must resolve conflicts in the evidence and cannot rely on a "single piece of evidence" that "will not satisfy the

substantiality test." *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). As a general matter, an ALJ must give more weight to the opinions of examining physicians over non-examining physicians, but "[a]n ALJ can reject a treating physician's opinion, and thus obviously a consultative examiner's opinion as well, where the opinion is (1) not well-supported by medically acceptable clinical and laboratory diagnostic techniques, or (2) inconsistent with other substantial evidence of record." *Ramos v. Colvin*, No. CV 14-3971 (ES), 2016 WL 1270759, at *5 (D.N.J. Mar. 31, 2016) (citing *Kreuzberger v. Astrue*, No. 07-529, 2008 WL 2370293, at *4 (W.D. Pa. June 9, 2008) (citing 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2))). Ultimately, "an administrative decision should be accompanied by a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).

Plaintiff argues the ALJ failed to give sufficient weight to the opinions of Drs. Patel, Rinnier, Cornejo, and Lazarus. We disagree. As to Dr. Patel, the ALJ gave "great weight" to his opinion, adopting much of his conclusions about Plaintiff's ability to work. (R. 38.) The ALJ did, however, assign little weight to Dr. Patel's opinion that Plaintiff could sit for less six hours a day, on the basis that it was inconsistent with his treatment notes. (R. 38.) The ALJ also noted a number of inconsistencies between Dr. Patel's opinion and those of Drs. Wetzler and Cornejo. (R. 38.) Despite Plaintiff's argument, the ALJ was not obliged to adopt all of Dr. Patel's opinion. "A medical opinion given 'great weight' does not require an adoption of every conclusion in that opinion," *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004). As for Dr. Rinnier's opinion, the ALJ found that it was inconsistent with other evidence in the record, as it was at variance with the opinions of several other physicians. The ALJ's decision to give little weight to Dr. Rinnier's opinion was supported by substantial evidence.

With respect to Dr. Cornejo's opinion, Plaintiff argues that the ALJ's grant of "partial weight" to Dr. Cornejo's assessment failed to inform subsequent reviewers—i.e., this Court—of the basis for the ALJ's weighing of the evidence. We disagree: the ALJ clearly noted some deficiencies in Dr. Cornejo's examination, such as not assigning a specific functional limitation to Plaintiff that quantified her exertional capacity, which justify attaching less weight to Dr. Cornejo's opinion.

As for Dr. Lazarus, who opined that Plaintiff had a relatively severe GAF score of 50, Plaintiff argues there was no other evidence available speaking to Plaintiff's psychiatric limitations and that the ALJ was obliged to adopt his conclusions. Again, we disagree. Although Dr. Lazarus's opinion is the only mental health consultation as such, the record is replete with informal references to Plaintiff's psychological status. This included the state agency psychiatrist, Dr. Yared, who reviewed Plaintiff's records on August 16, 2013—that review included the records of Dr. Lazarus—and concluded that Plaintiff had mild psychological limitations. (R. 84.) When discounting Dr. Lazarus's opinion as inconsistent, the ALJ focused on Plaintiff's sparse history of mental health treatment (R. 39), which provided a basis to find her psychiatric status inconsistent with a finding of disability. *See, e.g.*, *Gustin v. Colvin*, 2015 WL 4066650, at *2 (M.D. Pa. July 2, 2015) (affirming an ALJ's decision to discount a particular physician's opinion where the ALJ provided several reasons, including that the physician's opinion was "inconsistent with the plaintiff's relative lack of mental health treatment"). The ALJ had other reasons to be skeptical. Dr. Lazarus's opinion was found to be "inconsistent with his [own] exam findings" reporting Plaintiff's mood was fair and not overtly psychologically perturbed. (R. 38.) The ALJ also noted that Plaintiff was only mildly limited in daily activities, being able to drive, dust, prepare meals, and take care of her children sometimes. (R. 222-29.)

16

Finally, Plaintiff also argues that the ALJ rejected, in one form or another, some aspect of all of the medical evidence presented to him; even assuming this is true, we do not find it persuasive. Plaintiff argues that discrediting all evidence in one way or another is tantamount to an ALJ substituting her own expertise against that of a physician. Plaintiff is correct that an ALJ cannot simply disregard conclusions of experts in favor of her own, *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999), but that is not what the ALJ did in this case. The ALJ had a wealth of contradictory evidence before her; for her to judge the evidence this necessarily entailed discarding at least some of someone's expert opinion in order to reach a conclusion on Plaintiff's legal status. *Cf. Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006) ("There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC.").

B. **The ALJ's Determination as to Plaintiff's Credibility Was Supported by Substantial Evidence**

Plaintiff next argues that the ALJ did not give adequate weight to Plaintiff's testimony and improperly found her incredible. Credibility assessments involve a two-step process. First, the ALJ must determine whether there is an underlying medically determinable impairment that could reasonably be expected to produce the plaintiff's symptoms. 20 C.F.R. § 416.929(b). If such an impairment is found, the ALJ must next evaluate the intensity, persistence, and limiting effects of the plaintiff's symptoms to determine the extent that they limit the plaintiff's ability to do basic work activities. 20 C.F.R. § 416.929(c). In evaluating the intensity, persistence, and limiting effects, the ALJ must consider all of the available evidence. *Id.* When statements about the intensity, persistence, or functionally limiting effects of symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the statements based

17

on a consideration of the entire case record. 20 C.F.R. § 416.929(c)(4). The ALJ "can reject such claims if he does not find them credible." *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F.3d 429, 433 (3d Cir. 1999.) A reviewing court should defer to an ALJ's credibility determination, especially where he has the opportunity at a hearing to assess a witness's demeanor. *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003). *See also Hoyman v. Colvin*, 606 F. App'x 678, 681 (3d Cir. 2015) ("Credibility determinations of an administrative judge are virtually unreviewable on appeal.") (internal quotation marks omitted).

The ALJ agreed that claimant's medically-determinable impairments could be expected to cause her alleged symptoms. However, she disagreed about the intensity, persistence, and limiting effects of these symptoms, finding Plaintiff's statements to be not "entirely credible." (R. 34.) First, the ALJ noted that Plaintiff admitted she had stopped working in 2010 due to being laid off, not due to her impairments. (R. 34, 231.) "When a claimant discontinues work for reasons unrelated to his or her alleged disability, the ALJ is permitted to consider that fact in determining the extent to which a claimant's assertions are credible." *Sartor v. Colvin*, 2015 WL 4064674, at *10 (D.N.J. July 2, 2015). Second, the ALJ explained that certain objective medical evidence conflicted with Plaintiff's allegations about the severity of her symptoms, in particular Plaintiff's allegation that she cannot perform sedentary work. (R. 33-34.) Although further explication is unnecessary, we also note that Plaintiff's allegations that she could not perform sedentary work contradicted the opinions of Drs. Shastry, Rabelo, and Yared, to whom the ALJ accorded some weight. (R. 39.) The record, as interpreted by the ALJ, provides substantial evidence to support her credibility determinations.

Plaintiff also argues that the subsequent passage of SSR 16-3p, 2016 WL 1237954, shows the ALJ erred. This is irrelevant. SSR 16-3p became effective on March 16, 2016, after the decision

in this case on July 16, 2015. The ALJ was not bound by SSR 16-3p but rather by the previous SSR 96-7p. Yet even if the ALJ was bound by SSR 16-3p, this Court's analysis of Plaintiff's subjective symptoms remains the same. SSR 16-3p states that an ALJ must evaluate a claimant's symptoms based on all evidence in the record and not the claimant's character. (R. 36-38.) In this dispute, the ALJ partially discounted Plaintiff's testimony because portions conflicted with the record, not because of Plaintiff's character. We find the ALJ did not err in her treatment of Plaintiff's subjective complaints. *See Pettus v. Comm'r of Soc. Sec.*, 2016 WL 5858979, at *2 (D.N.J. Oct. 6, 2016).

Finally, Plaintiff's citation to medical records that bolster her allegations is immaterial. The question before the Court is not whether Plaintiff could support her finding of disability; it is whether the ALJ's non-disability determination is supported by substantial evidence. As the Third Circuit has explained, "[t]he presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision." *Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 764 (3d Cir. 2009).

### C. The ALJ's Assessment of Plaintiff's Residual Functional Capacity

Plaintiff next argues that the ALJ's assessment of Residual Functional Capacity was mistaken because the ALJ failed to identify a symptom—namely, radiculopathy—at the second step of the evaluation process. But the Third Circuit has noted that even if an ALJ erroneously finds an impairment to be non-severe, the error is harmless if the ALJ finds in the plaintiff's favor. *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 n.2 (3d Cir. 2007) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005)). The ALJ determined that Plaintiff had several severe impairments, and proceeded to the rest of the analysis. Although Plaintiff maintains that this alleged oversight infected the rest of the ALJ's analysis, we disagree. The ALJ explicitly

considered the "entire record," including symptoms relating to Plaintiff's radiculopathy, and "absent evidence to the contrary, we take her at her word." *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014).

### D. Summary Judgment

Finally, Plaintiff argues that summary judgment in favor of her is appropriate on the facts before the ALJ. As we have found that the ALJ had substantial evidence to reach her decision, Plaintiff's request for summary judgment is denied.

### IV. CONCLUSION

We will not disturb the Commissioner's decision. **AFFIRMED**.

Dated: March 19, 2018 /s Robert B. Kugler
ROBERT B. KUGLER
United States District Judge

20